**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

```
TERESA ANN REYNOLDS JOHNSON,     *
                                 *
     Plaintiff,                  *
                                 *
vs.                              *
                                 *   CIVIL ACTION NO. 19-01111-B
ANDREW M. SAUL,                  *
Commissioner of Social           *
Security,                        *
                                 *
     Defendant.                  *
```

**ORDER**

Plaintiff Teresa Ann Reynolds Johnson (hereinafter "Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security denying her claim for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*.  On September 30, 2020, the parties consented to have the undersigned Magistrate Judge conduct any and all proceedings in this case.  (Doc. 16). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  (Doc. 18).  Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

I.   **Procedural History**[1]

Plaintiff protectively filed her application for benefits on February 15, 2017, alleging disability beginning August 1, 2016, based on viral cardiomyopathy, cervical degenerative disc disease, and left knee issues.  (Doc. 9 at 83, 160, 164).  Plaintiff's application was denied at the initial stage.  (Id. at 80, 84).  Upon timely request, she was granted an administrative hearing, which was held on October 11, 2018.  (Id. at 32, 89, 106, 131).  Plaintiff, who was represented by counsel, attended the hearing in person and provided testimony related to her claims.  (Id. at 32-61).  A vocational expert (hereinafter "VE") also testified at the hearing.  (Id. at 61-69).  On January 2, 2019, the Administrative Law Judge (hereinafter "ALJ") issued an unfavorable decision finding that Plaintiff is not disabled.  (Id. at 20-28).  The Appeals Council denied Plaintiff's request for review on October 22, 2019.  (Id. at 4).  Therefore, the ALJ's decision dated January 2, 2019 became the final decision of the Commissioner.  (Id.).

Having exhausted her administrative remedies, Plaintiff timely filed the present civil action.  (Doc. 1).  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. § 405(g).

---

[1] The Court's citations to the transcript in this order refer to the pagination assigned in CM/ECF.

## II.  Issues on Appeal

1.  **Whether the ALJ erred in his evaluation of Plaintiff's subjective complaints of pain?**

2.  **Whether the ALJ's findings at step five of the sequential evaluation process are supported by substantial evidence?**

## III. Factual Background

Plaintiff was born on September 14, 1968 and was fifty years of age at the time of her hearing on October 11, 2018.  (Doc. 9 at 37).  Plaintiff has a high school diploma and attended community college but did not earn a degree.  (Id.).  She last worked as a stock clerk for Best Buy from 2011 to May 2016.  (Id. at 62, 165, 185-86).

In September 2016, Plaintiff presented to Alabama Orthopaedic Clinic with complaints of neck pain and radiating left arm pain and numbness.  (Id. at 257).  She received a C6-C7 cervical epidural steroid injection shortly thereafter.  (Id. at 256).  A cervical spine MRI performed in October 2016 revealed a posterior broad-based disc herniation at C5-C6 and cervical disc disease, most pronounced at the C5-C6 and C6-C7 levels.  (See id. at 250, 253-54).  In November 2016, Plaintiff underwent a C5-C6 anterior cervical decompression with fusion.  (Id. at 249).  After the surgery, Plaintiff continued to complain of neck and left upper extremity pain and was treated with medications and a trigger point injection.  (Id. at 243, 245, 247, 262-63, 268, 274, 276, 278-81).

3

Although Plaintiff reported severe left shoulder pain and reduced left shoulder strength and range of motion, a September 2017 MRI of her left shoulder was normal and revealed no abnormality. (See id. at 268, 274, 276-77). On her last date of orthopedic treatment, in November 2017, Plaintiff indicated that she wished to proceed with a second neck surgery, but the surgery was never performed. (Id. at 54-55, 283).

Plaintiff also alleged colon spasms, cardiomyopathy, and vertigo as impairments. (Id. at 43, 51-53, 58-60, 164). The record does not reflect treatment for colon spasms, and Plaintiff's last recorded treatment for Takotsubo cardiomyopathy was in 2009. (See id. at 285). With regard to her vertigo, the record reflects that Plaintiff presented to the emergency room in March 2018 complaining of chest pain. (Id. at 315). She also reported that she had sustained a fall several weeks earlier and had experienced some dizziness for the past month which had progressively worsened. (Id. at 315, 318). A brain CT, chest x-ray, and EKG telemetry monitoring performed at the hospital were normal, and Plaintiff's symptoms improved after she was given Meclizine and pain medications. (Id. at 308-10, 317-18).

IV. **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining (1) whether the decision of the Commissioner is supported by

substantial evidence and (2) whether the correct legal standards were applied.[2]  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).   A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).   The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  "Substantial evidence is more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  In determining whether substantial evidence exists, a reviewing court must consider the record as a whole, taking into account evidence both favorable and unfavorable to the Commissioner's decision.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, at *4 (S.D. Ala. June 14, 1999).

## V.   **Statutory and Regulatory Framework**

An individual who applies for Social Security disability benefits must prove her disability.   20 C.F.R. § 404.1512. Disability is defined as the "inability to engage in any

---

[2] This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. § 404.1505(a). The Social Security regulations provide a five-step sequential evaluation process for determining whether a claimant has proven her disability. See 20 C.F.R. § 404.1520.

Under this process, the claimant must first prove that she is not engaged in substantial gainful activity. Carpenter v. Comm'r of Soc. Sec., 614 F. App'x 482, 486 (11th Cir. 2015) (per curiam).[3] The second step requires the claimant to prove that she has a severe impairment or combination of impairments. Id. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. Id. If the claimant cannot prevail at the third step, the ALJ must determine the claimant's residual functional capacity ("RFC") before proceeding to step four. Id. A claimant's RFC is an assessment, based on all relevant medical

---

[3] Federal Appendix cases are unpublished Eleventh Circuit opinions and are not considered binding precedent, but they may be cited as persuasive authority. 11th Cir. R. 36-2; Henry v. Comm'r of Soc. Sec., 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

and other evidence, of a claimant's remaining ability to work despite her impairments. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

Once a claimant's RFC is determined, the evaluation proceeds to the fourth step, where the claimant must prove an inability to perform her past relevant work. Carpenter, 614 F. App'x at 486. If a claimant meets her burden at the fourth step, it then becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's RFC, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985) (per curiam). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the burden then shifts back to the claimant to prove her inability to perform those jobs in order to be found disabled. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

## VI. **The ALJ's Findings**

In the case *sub judice*, the ALJ found that Plaintiff has the severe impairment of degenerative disc disease status post fusion at C5-C6. (Doc. 9 at 22). The ALJ also found that Plaintiff's impairments, when considered individually and in combination, do not meet or medically equal the severity of any of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Id. at 23). The ALJ determined that Plaintiff has the RFC to perform a range of light work, with the following additional limitations: she cannot climb ladders, ropes, or scaffolds; she cannot reach above the shoulder with the left upper extremity; she can occasionally reach in all other directions with the left upper extremity; she has no limitations in her dominant right upper extremity; she can frequently climb ramps or stairs; she can frequently stoop, kneel, or reach;[4] she cannot crawl; and she can occasionally operate hand controls with the left upper extremity. (Id.). Based upon the testimony of the VE, the ALJ determined that Plaintiff is unable to perform her past relevant work as a stock clerk but can perform other jobs that exist in significant numbers in the national economy, such as mail clerk, floor attendant, and collator operator. (Id. at 27-28). Thus, the ALJ concluded that Plaintiff is not disabled. (Id. at 28).

---

[4] After finding that Plaintiff cannot reach above shoulder level but can occasionally reach in all other directions with her left upper extremity, and that she has no limitations in the dominant right upper extremity, the ALJ stated: "She can frequently climb ramps, stairs, stoop, kneel or *reach*. She cannot crawl." (Doc. 9 at 23) (emphasis added). The statement that Plaintiff can frequently reach appears to be a typographical error. The ALJ's decision had already addressed Plaintiff's extremity-specific reaching abilities, and the ALJ's hypothetical to the VE assumed frequent crouching, but the RFC assessment in the decision does not address Plaintiff's ability to crouch. Thus, it appears that the ALJ meant to state that Plaintiff can frequently *crouch*.

## VII. <u>Discussion</u>

### A. **Substantial evidence supports the ALJ's RFC assessment and evaluation of Plaintiff's allegations of pain.**

Plaintiff first argues that the ALJ erred in finding Plaintiff's statements concerning the intensity, persistence, and limiting effects of her pain not entirely consistent with the medical and other evidence of record, because the reasons the ALJ provided for discounting Plaintiff's allegations of pain are not supported by substantial evidence. (Doc. 10 at 3-13). The Commissioner counters that the ALJ properly found that the medical record evidence, lack of treatment after November 2017, consultative examination findings, and Plaintiff's daily activities were inconsistent with Plaintiff's allegations of disabling pain and supported the finding that Plaintiff could perform a reduced range of light work. (Doc. 13 at 5-13). Having carefully reviewed the record, the Court finds that Plaintiff's claim is without merit.

A claimant's statements of pain or other subjective symptoms alone are insufficient to establish disability. 20 C.F.R. § 404.1529(a); Social Security Ruling 16-3p ("SSR 16-3p"), 81 Fed. Reg. 14166, 14167 (Mar. 16, 2016). Rather, when a claimant attempts to establish disability based on testimony of pain and other symptoms, she must satisfy two parts of a three-part "pain standard" that requires (1) evidence of an underlying medical

condition, and (2) either (a) objective medical evidence confirming the severity of the alleged pain arising from that condition, or (b) evidence establishing that the objectively determined medical condition can reasonably be expected to give rise to the alleged pain. See Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam)).

"If the objective medical evidence does not confirm the severity of the claimant's alleged symptoms but the claimant establishes that [s]he has an impairment that could reasonably be expected to produce her alleged symptoms, the ALJ must evaluate the intensity and persistence of the claimant's alleged symptoms and their effect on h[er] ability to work." Spears v. Berryhill, 2017 U.S. Dist. LEXIS 160385, at *16, 2017 WL 4340508, at *6 (N.D. Ala. Sept. 29, 2017); see 20 C.F.R. § 404.1529(c); SSR 16-3p, 81 Fed. Reg. 14166 at 14168. "In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and her doctors." Strickland v. Comm'r of Soc. Sec., 516 F. App'x 829, 831 (11th Cir. 2013) (per curiam) (citing 20 C.F.R. § 404.1529(c)(1)-(2)); see also SSR 16-3p, 81 Fed. Reg. 14166 at 14168.

The ALJ also may consider other factors set forth in the regulations, including a claimant's daily activities; the

location, duration, frequency, and intensity of pain or other symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness, and side effects of medication; any treatment other than medication; other measures used by the claimant to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Strickland, 516 F. App'x at 831-32 (citing 20 C.F.R. § 404.1529(c)(3)); see also SSR 16-3p, 81 Fed. Reg. 14166 at 14169-70. The ALJ then examines the claimant's statements about the intensity, persistence, and limiting effects of symptoms in relation to all other evidence and considers whether they are consistent with the record as a whole. Hargress v. Soc. Sec. Admin., Comm'r, 883 F.3d 1302, 1308 n.3 (11th Cir. 2018) (per curiam) (citing SSR 16-3p, 81 Fed. Reg. 14166 at 14170); see also 20 C.F.R. § 404.1529(c)(4).

The ALJ is not required to accept a claimant's allegations of pain merely because the claimant has established that her impairment could reasonably be expected to produce her alleged symptoms. See Wilson, 284 F.3d at 1225-26. However, if the ALJ decides not to credit a claimant's statements about her pain, "the ALJ must articulate explicit and adequate reasons for doing so or the record must be obvious" as to the finding. Strickland, 516 F. App'x at 832 (citing Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995)). Failure to articulate the reasons for discrediting

testimony related to pain or other subjective symptoms requires, as a matter of law, that the testimony be accepted as true. Holt, 921 F.2d at 1223. When the ALJ's reasons for discrediting a claimant's statements about pain or other symptoms are clearly articulated and supported by substantial evidence in the record, a reviewing court will not disturb the ALJ's findings. Foote, 67 F.3d at 1562; see also Werner v. Comm'r of Soc. Sec., 421 F. App'x 935, 939 (11th Cir. 2011) (per curiam) ("The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it.").

As Plaintiff acknowledges, the ALJ followed the process outlined above in evaluating her allegations of pain and other symptoms. The ALJ summarized the medical evidence of record, including Plaintiff's orthopedic treatment records and radiology reports, the report from Plaintiff's consultative medical examination, and hospital emergency department records from 2018. (Id. at 24-26). The ALJ also outlined Plaintiff's activities of daily living. (Id. at 27). The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical

evidence and other evidence in the record for the reasons explained in this decision." (Id. at 25).

After making this finding, the ALJ explained that he assigned "great weight" to Plaintiff's orthopedic treatment notes, which showed that the last time Plaintiff presented for treatment was when she stated she was ready for surgery in November 2017, but the record does not reflect that Plaintiff was ever referred for surgery. (Id.). The ALJ also noted that the records from Plaintiff's emergency department visits in 2018 do not list any problems with the left upper extremity. (Id. at 26). In addition, the ALJ assigned "substantial weight" to the report from Plaintiff's April 2017 consultative medical examination, which the ALJ found to be "essentially normal." (Id.). He also pointed out that Plaintiff continued to perform heavy duty work until May 2016. (Id.).

The ALJ concluded that the alleged "severity of the symptoms and the alleged effect on function is not entirely consistent with the total medical and non-medical evidence, including statements by the [Plaintiff] and others, observations regarding activities of daily living, and alternations of usual behavior or habits. There are some allegations and symptoms that appear to be disproportionate to the expected severity and duration that would be expected on the basis of the [Plaintiff's] medically determinable impairments." (Id.). The ALJ further stated:

> Two factors weigh against the [Plaintiff's] allegations
> of pain.  First, according to the record the [Plaintiff]
> has not received any regular and ongoing treatment for
> the alleged pain.  Additionally, findings from physical
> examination were minimal as previously discussed.  The
> lack of treatment and the findings from examinations do
> not support the claimant's allegations of pain and
> limitations.

(Id. at 26-27).

Plaintiff focuses on this final passage, arguing that the two "factors" listed by the ALJ as weighing against her allegations of pain, namely, lack of regular and ongoing treatment for the alleged pain and minimal physical examination findings, are not supported by substantial record evidence.  (See Doc. 10 at 4-12). Specifically, Plaintiff contends that her treatment during the relevant period was ongoing and substantial and that "it is reasonably clear that she would have had further treatment and undergone surgery" had she not lost insurance coverage in early 2018.  (Id. at 5-10).  She further asserts that the ALJ's stated reason of "minimal" physical examination findings is not credible because the record actually includes multiple physical examination findings and MRI results that support her testimony of severe pain. (Id. at 10-12).

The record reflects that Plaintiff first presented to Tim S. Revels, M.D. at Alabama Orthopaedic Clinic on September 2, 2016, complaining of neck pain radiating into the left arm, which had been present for years.  (Doc. 9 at 257).  Plaintiff reported that

recent chiropractic management of her symptoms was transiently effective, but medication, ice, heat, and stretching were of no help. (Id.). Dr. Revels reviewed radiographic images of Plaintiff's cervical spine, which revealed degenerative disc disease at C5-C6 and C6-C7. (Id.). On examination, Plaintiff's neck had limited and painful range of motion on all planes tested with spasm and stiffness noted; however, Spurling's and Lhermitte's tests were negative, and Plaintiff's neck exhibited normal paraspinal muscle strength and tone, normal muscle bulk, and no swelling, deformities, evidence of instability, weakness, or atrophy. (Id. at 258-59). An examination of Plaintiff's left shoulder and arm was entirely normal, revealing full and painless range of motion and no tenderness, swelling, deformities, instability, weakness, or atrophy. (Id. at 259). Plaintiff's gait was normal and smooth, and she was able to stand without difficulty. (Id.). Dr. Revels ordered a cervical spine MRI and a cervical epidural steroid injection. (Id. at 259-60). Plaintiff received a C6-C7 cervical epidural steroid injection on September 13, 2016. (Id. at 256).

A cervical spine MRI performed on October 5, 2016 showed, inter alia, anterior spondylosis, posterior broad-based disc herniation, and right worse than left foraminal encroachment secondary to uncovertebral and facet joint hypertrophy at C5-C6; anterior spondylosis, diminished disc signal, posterior

subligamentous disc bulge and uncovertebral joint hypertrophy bilaterally, left worse than right, with facet hypertrophy resulting in moderate left and mild to moderate right foraminal encroachment at C6-C7; posterior broad-based disc bulge, bilateral uncovertebral and facet joint hypertrophy resulting in subtle foraminal encroachment without neurocompression at C4-C5; and a punctate midline focal disc herniation without contact on the spinal cord, bilateral facet hypertrophy, subtle uncovertebral joint hypertrophy without neurocompression on the exiting nerve roots, and mild right worse than left foraminal encroachment at C3-C4. (Id. at 253). It was further noted that the most significant acquired stenosis was at the C5-C6 level, and there was a straightened cervical curvature suspicious for muscle spasm. (Id. at 254).

When Plaintiff returned to Alabama Orthopaedic Clinic to review her MRI on October 6, 2016, she reported some relief in her neck (presumably from the epidural steroid injection) but stated that her pain symptoms continued to significantly affect her normal daily activities. (Id. at 250). A physical examination of Plaintiff's neck revealed pain with palpation and percussion of paraspinal musculature and limited range of motion, but no swelling, deformities, instability, weakness, atrophy, or alterations of tone, and negative Spurling's, Lhermitte's, and Hoffman's tests. (Id. at 251). An examination of Plaintiff's

upper extremities was entirely normal.  (Id. at 251-52).  Plaintiff indicated that she wished to proceed with surgery, and on November 4, 2016, Dr. Revels performed a C5-C6 anterior decompression with fusion.  (Id. at 249, 252).

At a post-operative visit on November 17, 2016, Plaintiff reported that her pre-operative symptoms persisted.  (Id. at 247). Radiographic images of Plaintiff's surgically repaired neck showed the hardware to be well-positioned with no loosening or failure and the bone graft at C5-C6 to be well-aligned.  (Id.).  On December 15, 2016, Plaintiff reported that her pre-operative symptoms had improved, but that she had experienced significant muscle spasms over the past couple of days.  (Id. at 245).  It was noted that Plaintiff was not taking any pain medication and was taking a muscle relaxer at bedtime only.  (Id.).

On February 1, 2017, Plaintiff continued to report improvement in her pre-operative symptoms, but it was noted that Plaintiff "still gets significant pain into the posterior trapezius muscles and occasionally into the left shoulder if she over does any activity even if it is nonstrenuous."  (Id. at 243). A physical examination showed good healing of Plaintiff's surgical wound, limited (but within anticipated post-operative) cervical range of motion, and no change from pre-operative findings pertaining to Plaintiff's upper extremities.  (Id. at 244; see also id. at 246, 248).  Radiographic images showed that Plaintiff's

hardware was well-positioned, and the interbody bone graft was well-aligned but lacked definite consolidation. (Id. at 243).

On March 29, 2017, Plaintiff returned to Alabama Orthopaedic Clinic complaining of neck and left shoulder pain, which she said was getting worse. (Id. at 268). X-rays of Plaintiff's neck showed the surgical hardware to be well-positioned without loosening or failure, with "spot welding" of the bone graft in several spots. (Id.). Left shoulder x-rays showed a mildly high riding humerus but no significant structural abnormality. (Id.). On examination, Plaintiff exhibited normal gait and station and intact light touch sensation that was almost hypersensitive over the left superior shoulder/trapezius. (Id. at 270). Plaintiff's cervical range of motion was intact, but she had significant muscle tightness and spasm over the left distal cervical into superior and posterior trapezius/scapula. (Id.). Her left shoulder strength was mildly decreased due to pain, and her left shoulder had limited range of motion due to pain and was tender to palpation. (Id.).

Another cervical spine MRI was performed on April 7, 2017, which revealed interval placement of an anterior cervical fixation plate and interbody fusion at C5-C6 with improvement to the degree of central canal narrowing and exiting foraminal encroachment at C5-C6 as compared to Plaintiff's pre-operative MRI, and a mild annular bulge at C6-C7 with mild central canal narrowing and

moderate to severe foraminal encroachment on the left. (Id. at 272-73).

On April 15, 2017, Plaintiff presented to Darrel Alexander Ceballos, D.O. for a consultative medical examination. (Id. at 262). She reported severe neck pain with the inability to raise her left shoulder, lift or carry more than twenty pounds, reach overhead, or perform extended use of her left arm, as well as ongoing left knee discomfort that had not been medically evaluated and a history of viral cardiomyopathy. (Id. at 262-63). Plaintiff told Dr. Ceballos that she had no difficulty bathing, dressing, or feeding herself, and that she could brush her hair and teeth, perform simple chores such as sweeping or vacuuming, do laundry, go grocery shopping, hold a glass, turn a knob, tie a shoelace, and pick up small objects. (Id. at 263).

On examination, Plaintiff had no neck spasm, had normal gait, showed no evidence of ataxia or spasticity, was able to get on and off the examination table with ease, and could squat and rise and walk on her toes and heels with little difficulty. (Id. at 264-65). A neurological examination revealed 5/5 strength of both upper extremities, intact sensation, normal grip, no atrophy, normal fine and gross manipulation in terms of grip strength and dexterity, intact cranial nerves, physiologic and equal reflexes,

and intact coordination.[5]   (Id. at 265).   A musculoskeletal examination showed normal thoracic spine, full lumbar spine range of motion, negative straight leg raise bilaterally, stable and non-tender joints, no evident subluxations, contractures, ankyloses, or thickening, and full range of motion of the shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally.   (Id.).   Cervical spine flexion and extension were 25°, right and left lateral flexion were 20°, and right and left rotation were not performed due to Plaintiff's report of physician restriction.   (Id.).

Dr. Ceballos diagnosed Plaintiff with cervical radiculopathy status post C5-C6 ACDF with questionable C6-C7 discogenic disease, unsubstantiated left rotator cuff injury, unspecified left knee pain, and history of viral cardiomyopathy that was stable without sign or symptoms of decompensation.   (Id. at 266).   He concluded by noting: "Additionally, a limited examination was performed due to claimant current acute illness of varicella zoster infection. An additional examination is suggested."   (Id.).

On May 19, 2017, Plaintiff returned to Alabama Orthopaedic Clinic and reported neck pain, as well as pain, numbness, and weakness in her left arm.   (Id. at 274).   On examination,

---

[5] However, Dr. Ceballos noted that a limited examination of the left shoulder was performed "due to patient reported limitation and discomfort."   (Doc. 9 at 265).

Plaintiff's muscle bulk and tone were normal, she was able to stand without difficulty and make a fairly smooth transition from seated to standing, and her gait was slightly antalgic without ataxia. (<u>Id.</u> at 275-76).  The paraspinal musculature in her neck was nontender to palpation, her cervical range of motion was slightly limited due to increased pain, and her left shoulder range of motion and strength were reduced.  (<u>Id.</u>).  It was recommended that Plaintiff proceed with a previously ordered left shoulder MRI and have a cervical ESB at C6-C7 to ascertain how much of her pain and weakness was due to her neck.  (<u>Id.</u> at 276).  It was also noted that Plaintiff's insurance was changing in the next four weeks, and that she would await new insurance to proceed with the discussed treatment plan.  (<u>Id.</u>).

In Plaintiff's September 27, 2017 treatment record from Alabama Orthopaedic Clinic, it was noted that an MRI of Plaintiff's left shoulder performed two days earlier was normal, and that Plaintiff had recently been treated with epidural steroids, which provided partially effective/temporary relief.  (<u>Id.</u> at 277-78). On examination, Plaintiff's cervical paraspinal musculature was tender to palpation on the left, there were palpable muscle spasms and trigger point noted with exquisite tenderness on the left, and Plaintiff's cervical range of motion was limited and painful.  (<u>Id.</u> at 279).  Plaintiff's left shoulder range of motion was limited only by increased upper extremity and left-sided neck and trapezius

pain.  (Id.).  Plaintiff exhibited normal muscle bulk and tone,
her gait was normal, she was able to stand without difficulty, and
she was able to transition fairly smoothly from seated to standing.
(Id.).  A trigger point injection into Plaintiff's left trapezius
was performed.  (Id. at 279-80).

Plaintiff last presented to Alabama Orthopaedic Clinic on
November 22, 2017.  (Id. at 281).  She reported ongoing neck pain,
left arm pain, and left shoulder pain along the C6/C7 distribution
that had progressively worsened.  (Id.).  It was noted: "She is
ready for surgery because she is miserable."  (Id.).  An
examination of Plaintiff's neck revealed limited and painful range
of motion, left-sided tenderness and muscle spasms, and positive
Spurling's test, but no deformities and negative Lhermitte's,
axial traction, and shoulder abduction tests.  (Id. at 282).
Plaintiff's left shoulder range of motion was limited by pain, and
her left upper extremity had decreased tone.  (Id. at 282-83).
Otherwise, Plaintiff's muscle bulk and tone were normal, she had
normal gait, and she was able to stand without difficulty and make
a fairly smooth transition from seated to standing.  (Id.).
Plaintiff indicated that she wished to proceed with surgery, a C6-
C7 ACDF with hardware removal of C5-C6 and reinsertion.  (Id. at
283).

On January 12, 2018, Plaintiff presented to South Baldwin
Regional Medical Center's emergency department with complaints of

fever, cough, myalgias, nausea, congestion, and vomiting. (Id. at 319). A physical examination was performed, which revealed full and normal range of motion and 5/5 motor strength in all extremities, grossly intact sensory, normal gait, normal movement and range of motion in the neck, and chronic tenderness of the posterior neck. (Id.). Plaintiff was diagnosed with influenza A. (Id. at 321).

On March 6, 2018, Plaintiff presented to CarolinaEast Medical Center's emergency department and reported severe left-sided chest pain that came on suddenly while she was driving to a court appearance. (Id. at 315). Upon physical examination, Plaintiff's neck was supple, non-tender, and had normal range of motion. (Id. at 316). Plaintiff's musculoskeletal and neurological examinations were also unremarkable, showing normal range of motion and strength in all extremities, no tenderness or swelling, and no focal neurologic deficits. (Id.). A chest x-ray, brain CT scan, and EKG telemetry monitoring were performed, all of which produced normal results. (Id. at 317-18).

On August 9, 2018, Plaintiff was brought to CarolinaEast Medical Center's emergency department by law enforcement when involuntary commitment papers were issued for reported suicidal threats by Plaintiff. (Id. at 305). On examination, Plaintiff's neck was supple, her pulses were equal, her cranial nerves were intact, she had no tenderness to palpation, and no focal strength

23

or sensory loss was noted.  (Id. at 305-06).  Plaintiff's involuntary commitment was reversed following a psychiatric evaluation, and she was discharged.  (See id. at 303-04, 306).

After reviewing the record at length, the Court finds that the ALJ provided substantial evidence for his finding that Plaintiff's subjective allegations of pain and other symptoms are considerably more restrictive than the record as a whole would suggest.  With respect to the lack of ongoing treatment, the ALJ noted that the last time Plaintiff presented for treatment for her neck was in November 2017.  Although she indicated her readiness for surgery at that time, the record reflects that she did not undergo a second neck surgery or obtain any additional treatment for her neck.

The ALJ specifically noted that the 2018 treatment records from South Baldwin Regional Medical Center and CarolinaEast Medical Center did not note any problems with Plaintiff's left upper extremity.  Those records also do not reflect that Plaintiff reported any problems with her neck.  Physical examination findings from those visits were uniformly normal as they pertained to Plaintiff's upper extremities, and findings relating to Plaintiff's neck were also normal except for one finding of chronic tenderness.  Given the foregoing, it was reasonable for the ALJ to conclude that the lack of treatment for or complaints of neck and

24

left upper extremity pain after November 2017 was inconsistent with the severe pain and limitations alleged.

Plaintiff argues that the ALJ should not have relied on her lack of treatment after November 2017 without considering her inability to pay for such treatment. At her hearing, Plaintiff testified that she had not had health insurance since February 2018, and that there was no insurance to have another neck surgery done. (Id. at 54). According to Plaintiff, the surgery was "scheduled for December 20th, [2017,] and [her] insurance company denied it, and then with no further test or exams done, on December 29th, they agreed to let [her] have the surgery done, but they didn't tell [her] until January [2018]. And the difference is, is it would have costed [her] $500 to have it done in December [2017], and it was going to cost [her] $6,100 to have it in January [2018]." (Id.). Plaintiff stated that she "didn't have the funds" to pay for the surgery in January 2018. (Id. at 55). Later in the hearing, Plaintiff testified: "So I can't get help for anything until I get insurance. And I can't get insurance because people look at me, and they want to charge me $1,500 a month for insurance, and we can't afford that." (Id. at 59).

Plaintiff cites Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987), for the proposition that, in order to deny benefits on the ground of failure to follow prescribed treatment, an ALJ must find that the claimant's ability to work would have been restored

had she followed the prescribed treatment.   (Doc. 10 at 9).
Plaintiff further states that "poverty excuses noncompliance" with
prescribed medical treatment, and that reversal is warranted where
it is not clear from an ALJ's opinion whether noncompliance with
prescribed treatment formed the basis for denial of benefits.
(Doc. 10 at 9-10) (citing Dawkins v. Bowen, 848 F.2d 1211, 1213
(11th Cir. 1988) and Patterson v. Bowen, 799 F.2d 1455, 1460 (11th
Cir. 1986)).

Plaintiff's arguments are unpersuasive.   First, while
Plaintiff's testimony regarding lack of insurance may explain why
Plaintiff did not have a second neck surgery, it does not explain
why Plaintiff had *no* recorded treatment for her neck after November
2017, despite having insurance coverage until February 2018.
Second, there is no evidence that Plaintiff is indigent or lacks
access to any medical care.   Indeed, the record reflects that
Plaintiff twice sought emergency room treatment in 2018 for issues
unrelated to her allegedly disabling impairments, including once
after her insurance had lapsed.   Third, the ALJ did not deny
benefits solely or primarily on the grounds of Plaintiff's failure
to follow prescribed treatment, nor did he unduly base his decision
on Plaintiff's failure to seek treatment after November 2017.
Instead, the ALJ appropriately considered Plaintiff's lack of
treatment after November 2017 along with other evidence, including
Plaintiff's orthopedic treatment records, Dr. Ceballos'

consultative examination report, Plaintiff's daily activities, and the lack of complaints or positive examination findings relating to Plaintiff's neck and left upper extremity in the 2018 hospital records.  See Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (finding that the ALJ's failure to consider the claimant's inability to afford his seizure medication was not reversible error where the ALJ's disability determination was not significantly based on a finding of noncompliance).

The ALJ provided additional support for his assessment by citing the relatively mild findings from Plaintiff's consultative examination with Dr. Ceballos.  (See Doc. 9 at 25).  As noted supra, Dr. Ceballos' physical examination of Plaintiff revealed no neck spasm, 5/5 strength in the left upper extremity, full range of motion in both upper extremities, normal grip strength and dexterity, no muscle atrophy, intact sensation, intact coordination, stable and non-tender joints, normal gait, and the abilities to squat and rise and get off and on the examination table with ease.  (Id. at 264-66).

The ALJ further found that the alleged severity and functional effects of Plaintiff's symptoms were not entirely consistent with the evidence of Plaintiff's activities and abilities.  (Id. at 26); see 20 C.F.R. § 404.1529(c)(3)(i); SSR 16-3p, 81 Fed. Reg. 14166 at 14169.  As the ALJ noted, the record reflects that Plaintiff is active in her church and is able to prepare meals,

care for her husband and child, care for her dogs, play on her tablet, drive a car, go out alone, and shop in stores for food and clothing. (Doc. 9 at 27, 177-84). The record also reflects that Plaintiff is able to bathe, dress, and feed herself, brush her hair and teeth, sweep, vacuum, do laundry, and walk a half mile before needing to rest. (Id. at 182, 263).

Plaintiff contends that this case should be remanded for the purpose of obtaining an orthopedic consultative examination with a review of treatment records and test results. (Doc. 10 at 12-13). She points out that the consultative medical examiner, Dr. Ceballos, did not review any medical record evidence and suggested an additional examination because his examination was limited by Plaintiff's current acute varicella zoster infection. (Id. at 11-12) (citing Doc. 9 at 266). However, a review of Dr. Ceballos' report reflects that he performed a detailed physical examination, even if it was limited to some extent by Plaintiff's acute illness, self-reported left shoulder discomfort, and physician restriction relating to neck rotation. (See Doc. 9 at 264-66).

The ALJ is not required to order an additional consultative examination where the record contains sufficient evidence to permit the ALJ's RFC determination. Ingram v. Commissioner of Soc. Sec. Admin., 496 F.3d 1253, 1269 (11th Cir. 2007) ("The administrative law judge has a duty to develop the record where appropriate but is not required to order a consultative examination

as long as the record contains sufficient evidence for the administrative law judge to make an informed decision."); <u>Good v. Astrue</u>, 240 F. App'x 399, 404 (11th Cir. 2007) (per curiam) ("[T]he ALJ need not order an additional consultative examination where the record was sufficient for a decision."). The record in this case was sufficient to enable an informed decision, and remand for an additional consultative examination is not warranted.

In light of the foregoing, the Court finds that the reasons provided by the ALJ for finding Plaintiff's allegations of pain and other symptoms not entirely consistent with the record as a whole are supported by substantial record evidence. Indeed, Plaintiff has failed to show that any limitations caused by her impairments exceed the RFC and are not accommodated by the RFC and its stated restrictions.[6] Accordingly, Plaintiff's claim must fail.

---

[6] Although Plaintiff has cited evidence in the record which she claims supports a finding that she is disabled, that is, at best, a contention that the record evidence supports a different finding. That is not the standard on review. The issue is not whether there is evidence in the record that would support a different finding, but whether the ALJ's finding is supported by substantial evidence. <u>See</u> <u>Figueroa v. Comm'r of Soc. Sec.</u>, 2017 U.S. Dist. LEXIS 181734, at *15, 2017 WL 4992021, at *5 (M.D. Fla. Nov. 2, 2017) ("Although Plaintiff cites to certain test results, notes, and physical therapy findings as support for her contention that 'there were objective medical findings that support the doctor's opinions about [her] limitations' . . ., this is, at best, a contention that the record could support a different finding. This is not the standard on review. The issue is not whether a different finding could be supported by substantial evidence, but whether *this* finding is.") (emphasis in original).

**B. Substantial evidence supports the ALJ's conclusion at step five of the sequential evaluation process.**

Next, Plaintiff argues that the ALJ erred in finding that she can perform other jobs that exist in significant numbers in the national economy. (Doc. 10 at 13-19). As noted *supra*, the ALJ found at step five that Plaintiff can perform other work, namely, the representative occupations of mail clerk, floor attendant, and collator operator, all light and unskilled. (Doc. 9 at 27-28). Plaintiff argues, and the Commissioner concedes, that the ALJ erred in finding that she can perform the jobs of mail clerk and collator operator because the VE testified that an individual with Plaintiff's RFC could *not* meet the requirements of those occupations. (Doc. 10 at 15; Doc. 13 at 14). Plaintiff further argues that the ALJ failed to resolve an apparent conflict between the VE's testimony that the floor attendant job would require only *occasional* non-above-the-shoulder reaching with the non-dominant left upper extremity and the statement in the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"), a companion publication to the Dictionary of Occupational Titles ("DOT"), that the position of floor attendant requires *frequent* reaching. (Doc. 10 at 15-19); see U.S. Dept. of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (1993).

Thus, Plaintiff contends that the ALJ's step five determination is not supported by substantial evidence.  (Doc. 10 at 19).

In Washington v. Comm'r of Soc. Sec., 906 F.3d 1353 (11th Cir. 2018), the Eleventh Circuit held that "the ALJs within the SSA have an affirmative duty to identify apparent conflicts between the testimony of a Vocational Expert and the DOT and resolve them." 906 F.3d at 1356.  The court explained that:

> This duty requires more of the ALJ than simply asking the VE whether his testimony is consistent with the DOT. Once the conflict has been identified, the Ruling requires the ALJ to offer a reasonable explanation for the discrepancy, and detail in his decision how he has resolved the conflict.  The failure to discharge this duty means that the ALJ's decision, when based on the contradicted VE testimony, is not supported by substantial evidence.

Id.  An "apparent conflict" is "more than just a conflict that is made apparent by the express testimony of the VE."  Id. at 1365.

> It is a conflict that is reasonably ascertainable or evident from a review of the DOT and the VE's testimony. At a minimum, a conflict is apparent if a reasonable comparison of the DOT with the VE's testimony suggests that there is a discrepancy, even if, after further investigation, that turns out not to be the case.

Id.  Indeed, whether during or after a hearing,[7] "the ALJ is expected to take notice of apparent conflicts, even when they are

---

[7] The court explained that the ALJ may resolve an apparent conflict in one of two ways: "the ALJ must ask the VE whether there is a conflict and must ask for an explanation if there appears to be a conflict," or when an ALJ identifies an apparent conflict that was not raised during a hearing, the ALJ "can request an explanation of the conflict by submitting interrogatories to the vocational expert."  Washington, 906 F.3d at 1363.

not identified by a party, and resolve them." Id. at 1363.

In the instant case, a VE was called to testify at Plaintiff's hearing as to jobs that Plaintiff could perform with her specified limitations. The ALJ first posed a hypothetical question to the VE that included the restrictions of no reaching above shoulder level with the non-dominant left upper extremity, frequent reaching in all other directions with the left upper extremity, and no restrictions as to the dominant right upper extremity. (Doc. 9 at 62-63). The ALJ asked whether there were jobs that an individual could perform with the listed restrictions. (Id. at 63). The VE responded:

> VE: I'm sure there would.
> Before I give specific examples, there are a couple issues I need to address. The Dictionary of Occupational Titles does not – and the companion publication do not differentiate between the use of one upper extremity versus the other for tasks like reaching or operating hand controls. Because of that, what I'll be doing is relying on the DOT and companion publication, but I'm also going to be relying on my work experience, which includes 30 years in rehabilitation, performing formal and informal job analyses, as well as ongoing labor market research throughout that time period, having seen, either the occupation that we'll discuss or at least similar occupations – having seen them actually performed so that I know that they meet the limitations that you've noted specifically to the upper extremity.
>
> ALJ: Okay.
>
> VE: Given that, one example that would be consistent with these limitations is a mail clerk. The DOT code is 209.687-026. This is unskilled, light work with approximately 95,000 in the national economy.

A second example is a floor attendant. DOT code is 343.467-014. This is unskilled, light work, with approximately 274,000 in the national economy.
A third example is collator operator. The DOT code is 208.685-010. This is unskilled, light work, with approximately 239,000 in the national economy.

(Id. at 63-64).

The ALJ then changed the hypothetical to assume occasional, rather than frequent, non-above-the-shoulder reaching with the left upper extremity, with all other restrictions remaining the same.[8] (Id. at 64-65). The VE responded that "the floor attendant would likely not be impacted by that, particularly if this is the non-dominant upper extremity." (Id. at 65). However, the VE stated that the collator operator and mail clerk positions would likely be eliminated by the limitation to occasional reaching with the left upper extremity because they "would require more bimanual reaching" below shoulder level, but "the floor attendant would still remain." (Id. at 65-66). The VE also identified two other jobs that would be available to someone of Plaintiff's age, education, work experience, and RFC, namely, school bus monitor and tanning salon attendant. (Id. at 66).

In his decision, the ALJ stated:

[T]he Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.

---

[8] This revised hypothetical was consistent with the ALJ's ultimate RFC assessment. (See Doc. 9 at 23).

> The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as mail clerk (DOT 209.687-026) of which there are 95,000 jobs in the national economy; floor attendant (DOT 343.467-014) of which there are 274,000 jobs in the national economy and collator operator (DOT 208.685-010) of which there are 239,000 jobs in the national economy.

(Id. at 28). The ALJ further stated that he had determined that the VE's testimony was consistent with the information contained in the DOT. (Id.).

As an initial matter, it is readily apparent that the ALJ erred in concluding that a person with Plaintiff's limitations could perform the jobs of mail clerk and collator operator, because the VE testified that a person with Plaintiff's RFC could *not* perform those jobs. However, this error is potentially harmless, provided that the other identified job of floor attendant supports the ALJ's step five finding.[9] See, e.g., Bohn v. Astrue, 2013 U.S. Dist. LEXIS 16927, at *18, 2013 WL 494059, at *6 (M.D. Fla. Feb. 7, 2013) ("[E]ven if there had been an error with respect to the jobs of ticket seller and parking lot cashier, that error would be

---

[9] Social Security regulations provide that "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [his or her] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). The VE testified that there were approximately 274,000 floor attendant jobs in the national economy (Doc. 9 at 64), and Plaintiff does not argue that 274,000 is not a significant number of jobs. Rather, she disputes that she is able to meet the physical requirements of the floor attendant position. (See Doc. 10 at 13-19).

harmless since the photograph finisher job alone supports the law judge's finding that there are jobs in significant numbers in the national economy that the plaintiff can perform.").

The DOT and SCO describe the job of floor attendant, in the Amusement and Recreation industry, as follows:

> Verifies winning bingo cards to award prize or pay prize money to players holding winning cards: Collects money (fee) for participation in game and issues game cards to players.  Listens for shouts or looks for waving arms from players who have winning cards.  Compares numbers on card with numbers called and displayed on board to verify winning cards.  Gives prize or pays money to players holding winning cards.

DOT # 343.467-014, 1991 WL 672857.  They also specify that the job requires frequent[10] reaching.  Id.

Plaintiff argues that the ALJ erred by failing to resolve an apparent conflict between the DOT's definition of the floor attendant position as requiring frequent reaching and the VE's testimony that a claimant limited to occasional non-above-the-shoulder reaching with the non-dominant arm could perform the job of floor attendant.  (Doc. 10 at 18).  The Commissioner contends that there was no apparent conflict between the DOT and the VE's testimony because the DOT is silent as to whether the job of floor attendant requires frequent bilateral reaching.  (Doc. 13 at 15).

"A review of other Social Security disability cases

---

[10]  The SCO defines "frequently" as an activity or condition existing from one-third to two-thirds of the time.  See SCO, App. C, § C-3.

nationwide reveals conflicting approaches as to whether a conflict exists between a DOT job description requiring frequent reaching, and a VE's testimony that a claimant limited in only one extremity could perform the listed job." Swearengin v. Berryhill, 2018 U.S. Dist. LEXIS 178460, at *33-34, 2018 WL 5045216, at *12 (E.D. Tenn. Oct. 17, 2018). Compare Roxanne R. v. Berryhill, 2019 U.S. Dist. LEXIS 100753, at *17, 2019 WL 2502033, at *6 (N.D. Ill. June 17, 2019) ("[I]t is unclear whether the DOT's requirements of frequent reaching for the housekeeper/cleaner position includes bilateral reaching, which is precluded by Plaintiff's RFC at the frequency listed in the DOT. As such, the Court finds that the ALJ had an affirmative duty under SSR 00-4p to inquire about this apparent conflict."), and Swearengin, 2018 U.S. Dist. LEXIS 178460, at *36, 2018 WL 5045216, at *13 ("[A]n apparent conflict exists between the VE's testimony and the information provided in the DOT with respect to the three listed jobs . . . .  In response to the ALJ's question about potential conflicts, the VE stated that the DOT does not differentiate between bilateral reaching or reaching with different extremities.  These three positions all require frequent reaching, which is inconsistent with the ALJ's RFC determination that Plaintiff was limited to occasionally reaching above shoulder level with her right upper extremity.") (internal citation omitted), with Adams v. Astrue, 2010 U.S. Dist. LEXIS 85396, at *20-23, 2010 WL 3293344, at *8 (M.D. Fla. Aug. 19,

2010) (finding no conflict between VE's testimony that claimant could work as a maintenance dispatcher despite being limited to only occasional reaching and handling with the left upper extremity and the DOT's description of the job, which required frequent reaching and handling, "because the DOT is silent as to which jobs require working with one or both hands"), and Cooper v. Saul, 2020 WL 5525115, at *5 (W.D. Va. Sept. 1, 2020) (finding no apparent conflict between VE's testimony that a person permitted to use a cane for six hours daily could perform jobs with DOT descriptions requiring frequent reaching, handling, or fingering, because the SCO "does not define reaching, handling or fingering as bilateral activities").

The Court finds that there was no apparent conflict between the DOT's definition of the floor attendant job as requiring frequent reaching and the VE's testimony that a claimant limited to occasional non-above-the-shoulder reaching with the non-dominant upper extremity but having no limitations as to the dominant upper extremity could perform the job of floor attendant. The definition of "reaching" in the SCO is "[e]xtending hand(s) and arm(s) in any direction." SCO, App. C, § C-3. This definition appears to "contemplate[] that reaching may include only one hand or arm OR both hands or both arms, but it does not necessarily require the use of both hands or both arms." Cooper, 2020 WL 5525115, at *5; see also Adams, 2010 U.S. Dist. LEXIS 85396, at

*21, 2010 WL 3293344, at *8 ("This word choice implies the DOT acknowledges some jobs might require reaching . . . with only one hand and some might require reaching . . . with both hands."). At best, the DOT is silent on the issue of whether reaching necessarily requires the use of both upper extremities. See Boone v. Saul, 2021 U.S. Dist. LEXIS 14123, at *13, 2021 WL 252214, at *5 (M.D. Fla. Jan. 26, 2021) (noting that the DOT "does not address how to incorporate limb restrictions").

"Washington does not require the ALJ to draw inferences about job requirements that are unsupported by the DOT's text and then resolve conflicts between the VE's testimony and those unsupported inferences." Christmas v. Comm'r of Soc. Sec., 791 F. App'x 854, 857 (11th Cir. 2019) (per curiam); see also Melton v. Comm'r of Soc. Sec., 2018 U.S. Dist. LEXIS 165800, at *9, 2018 WL 4658199, at *3 (S.D. Fla. Sept. 27, 2018) ("[W]here the vocational expert testifies on a matter that is not explicitly inconsistent with the DOT, no conflict exists."). Because the VE's testimony did not present an apparent conflict with the generalized reaching requirement in the DOT, but rather served as a proper supplement to the information in the DOT, the ALJ did not err in relying on the VE's testimony that Plaintiff would be able to perform the job of floor attendant given her extremity-specific reaching limitations. Accordingly, the ALJ's finding that Plaintiff can perform other work that exists in significant numbers in the

national economy is supported by substantial evidence, and Plaintiff's claim must fail.

## VIII.    Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability and disability insurance benefits be **AFFIRMED.**

**DONE** this **18th** day of **March, 2021.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**